UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JEFFREY FARNESKI,

        Plaintiff,

   v.

COUNTY OF HUNTERDON, OFFICE
OF THE HUNTERDON COUNTY
PROSECUTOR, THE STATE OF NEW
JERSEY, PATRICK BARNES, and
DANIEL HURLEY,

        Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 09-4769
(JEI/KMW)

**OPINION**

**APPEARANCES:**

LAW OFFICES OF WILLIAM J. COURTNEY
William J. Courtney
200 Main Street
P.O. Box 112
Flemington, NJ 08822
    Counsel for Plaintiff

GREENBAUM & FLANAGAN, LLC
Robert J. Greenbaum
188 Eagle Rock Avenue
Suite 5
Roseland, NJ 07068
    Counsel for Defendants County of Hunterdon and Daniel
Hurley

LAW OFFICES OF JOHN R. PARKER, LLC
John R. Parker
260 Route 202/31
Suite 1100
Flemington, NJ 08822-1794
    Counsel for Defendants Office of the Hunterdon County
Prosecutor and Patrick Barnes

**IRENAS**, Senior District Judge:

This matter arises from Plaintiff Jeffrey Farneski's suit against Defendants Hunterdon County, Office of the Hunterdon County Prosecutor ("HCPO"), Patrick Barnes, and Daniel Hurley for violation of his civil rights and retaliation during his employment with HCPO.  Before the Court are the Motion for Summary Judgment of Defendants HCPO and Barnes (Dkt. No. 70) and the Motion for Summary Judgment of Defendants Hunterdon County and Hurley (Dkt. No. 71).[1]  For the reasons discussed below, summary judgment will be granted in favor of the Defendants on all counts.

## I.

For the purposes of these Motions, the Court resolves any factual disputes in favor of the Plaintiff, Jeffrey Farneski.[2] As the events discussed here span a period of over eight years, the Court will focus on only those facts relevant to the instant Motions.

---

[1] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

[2] In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir. 1986).

Farneski has been working for the Office of the Hunterdon County Prosecutor ("HCPO") since November 10, 1986. (CSMF1[3] ¶ 1) HCPO is an autonomous unit within Hunterdon County over which the County has some budgetary control. The New Jersey Attorney General's Office retains prosecutorial oversight of HCPO. (Hunterdon's Statement of Fact[4] 6)

Farneski was promoted twice between 1986 and 1995, achieving the rank of Detective Sergeant. He is the longest serving detective in HCPO. (CSMF1 ¶ 2)

Defendant Patrick Barnes became the Prosecutor of Hunterdon County in 2003 and remained in that capacity until May 6, 2010. (*Id.* ¶ 4) During his tenure, Barnes's behavior in the workplace was volatile and disruptive. He was prone to verbal outbursts and once punched a filing cabinet. (*Id.* ¶¶ 5-6)

Barnes also had clear favorites in the office, which he demonstrated through his repeated references to "The Nine." (*Id.* ¶ 9) The Nine consisted of a group of workers who Barnes felt were loyal to him and on whom he could rely. (*Id.*) Although it is not clear exactly who the Nine were, Defendant Hurley, Kristen Larsen, Linda Fabiano, Sam DeBella, Chelsea

---

[3] This citation refers to the Counterstatement of Material Facts and History in Farneski's Brief in Opposition to Defendants Barnes's and HCPO's Motion for Summary Judgment. (Dkt. No. 75)

[4] This citation refers to the Statement of Undisputed Fact in Defendants Hunterdon's and Hurley's Brief in Support of Summary Judgment. (Dkt. No. 71)

Barnes, and Ryan Neiber were likely included in this group.
(*Id.* ¶ 10)  Barnes consistently indicated his preference for the
Nine, telling them that they were the best and "fuck the rest."
(*Id.* ¶¶ 10-11)  Barnes also appeared to have a particular
attachment to Linda Fabiano and gave her preferential treatment.
(*Id.* ¶ 12)  Farneski was not one of the Nine, and Barnes did not
like Farneski.  (*Id.* ¶¶ 8-10, 13)

In 2004, Farneski reviewed Fabiano's time sheets and
discovered that they showed that Fabiano had worked on days when
she was not there.  (*Id.* ¶¶ 15-16)  Farneski reported these
falsifications to Ken Harding, who was Chief of Detectives at
the time, and later reported the falsifications to Chief Frank
Simonetta, who succeeded Harding in 2005.  (*Id.* ¶¶ 16-17)
According to Farneski, he was instructed to ignore the
falsifications and sign the time sheets.  When he refused to do
so, Barnes ordered that Farneski receive a formal reprimand.
This reprimand indicated that Farneski had been unwilling to
assist or cooperate with Fabiano.  (*Id.* ¶¶ 18-19)

After the incident, Barnes promoted Fabiano to Detective
Sergeant, the same rank as Farneski, and gave her some of
Farneski's job duties.  (*Id.* ¶ 20)  In September 2005, around
the time he reported Fabiano's time sheets, Farneski was asked
to prepare a memo about the investigation of a reported drug

overdose.  Barnes and Simonetta demanded that Farneski make changes to the memo that Farneski felt were both inaccurate and blamed him for his actions.  (*Id.* ¶¶ 22-24)  According to Farneski, Simonetta threatened Farneski with termination unless he signed the memo.  (*Id.* ¶ 25)  Soon after this incident, Farneski was denied a request for three days of vacation time.  (*Id.* ¶ 26)  He was not aware of any such request being denied prior to that.  (*Id.*)

In June 2005, Farneski became aware that Fabiano and other investigators had made inappropriate comments about gay men in general and certain staff members in particular that were inadvertently recorded on a witness interview tape.  After discovering that the evidence custodian had reported their comments, Fabiano decided to alter the tape before it was sent out in discovery.  (*Id.* ¶¶ 27-28)  Believing that Fabiano's actions violated the County Harassment Policy and Attorney General Guidelines, Farneski reported the incident to Simonetta, who refused to accept the complaint.  (*Id.* ¶¶ 29-30)

Sometime after he reported the alteration, Farneski was transferred from the major crimes unit to the terrorism unit.  (*Id.* ¶ 31)  Although it is unclear exactly when the transfer took place, it occurred before January 2007.  (HCPO's Ex. N

131:17-20)  Barnes created the terrorism unit, and it was
important to him.  (*Id.* 125:13-15, 126:1-2)

In late 2005 or early 2006, Barnes promoted Roy Aycock to
Lieutenant when Farneski should have been promoted instead.
(*Id.* ¶ 20)  At the time, Fabiano told Farneski, "If you only
left me alone about my time sheets you wouldn't be in this
position."  (*Id.* ¶ 21)

On January 12, 2006, Barnes and Farneski had an
altercation.  Barnes yelled at Farneski and hit Farneski's face
with his head, leaving a visible red mark.  (*Id.* ¶¶ 35-41)  In
response to this incident, Farneski obtained an attorney, Brian
Sige, who filed two formal complaint letters on Farneski's
behalf.  (*Id.* ¶¶ 42-44)  Farneski and his attorney had two
meetings with Wally Stafford, an investigator in the Attorney
General's office, to discuss the incident.  No formal
investigation resulted.  (*Id.* ¶¶ 46-47)

In July 2006, Farneski received a poor grade during his
performance evaluation from his supervisor, Aycock.  Farneski
challenged the evaluation, and Barnes eventually ordered that it
be changed to reflect a higher grade.  (*Id.* ¶ 67)

Farneski was promoted to Lieutenant in August 2007.  Around that time, he began attending training at the FBI Academy,[5] which required him to spend several months out of state.  (*Id.* ¶¶ 47-48)  When he returned, Farneski was given more responsibilities, including supervision over major crimes, narcotics, and sex crimes.  (*Id.* ¶ 49)  Farneski continued to supervise these units until summer and fall of 2008.

In January 2008, HCPO fired Katherine Errickson, who was pregnant at the time.  (*Id.* ¶¶ 51-52)  When she was fired, Errickson began experiencing physical discomfort and thought she was having contractions.  Farneski went over to her to try to assist her, although it is not clear what he could have done. (*Id.* ¶ 53)  At this point, DeBella ordered Farneski to leave Errickson alone.  (*Id.*)

Errickson filed a lawsuit against HCPO, Barnes, and Hurley in June 2008, alleging discrimination and wrongful termination. (*Id.* ¶¶ 55, 64)  Farneski and Errickson were friends, and Farneski supported her lawsuit.  He also told DeBella and Hurley that he would testify truthfully as a witness to the lawsuit and that they should have expected the lawsuit since they "fired a pregnant woman."  (*Id.* ¶¶ 55-56)  Although Hurley believed that

---

[5] Attending the FBI Academy was, as Farneski agreed, "a plumb assignment." (Defs. Barnes's & HCPO's Ex. A 206:15-23)  Further, Farneski could not have gone to the Academy without Defendant Barnes's approval.

Farneski had given a deposition in the case, Farneski never did so. Nevertheless, Farneski was told to "stay out" of the suit. (*Id.* ¶¶ 58-59)

After Farneski's conversation with Hurley and DeBella about the Errickson suit, Hurley, who became Chief of Detectives at HCPO in August 2008, (CSMF2[6] ¶ 1) and Barnes excluded Farneski from daily operations and stopped talking to him. Farneski began to lose his supervisory positions, beginning with his removal from narcotics in summer 2008 and from sex crimes in August or September 2008. (CMSF1 ¶¶ 60-61) Around this time, he was moved to an office away from the departments he supervised, which at that time were fatal accidents ("FACT") and major crimes. (CMSF2 ¶¶ 16-17) Farneski also received a lower raise than other Lieutenants, which DeBella attributed to Barnes being angry with Farneski. (CMSF1 ¶ 62) Finally, Farneski applied for a promotion to Deputy Chief, which he did not get. The position remained vacant. (*Id.* ¶ 63)

One of Farneski's co-workers, Aaron Lacey, described Hurley as a bully and a liar. He also stated that anyone "in the Farneski camp" would have problems with Hurley. (CSMF2 ¶¶ 2-3) Other co-workers also felt that Hurley was not always truthful

---

[6] This citation refers to the Counterstatement of Material Facts and Procedural History in Farneski's Brief in Opposition to Defendants Hurley's and HCPO's Motion. (Dkt. No. 76)

and would retaliate against employees.  (*Id.* ¶¶ 4-6)  At various times, Hurley sent Farneski emails questioning his authority, asked co-workers to lie about conversations they had with Farneski, prohibited him from going to union meetings, and put Farneski under surveillance.  (*Id.* ¶¶ 28-31)

In 2008, Michael Nugent began to experience harassment at HCPO in the form of photo-shopped images.  (*Id.* ¶¶ 7-8)  Nugent reported the harassment to Farneski, who was Nugent's immediate supervisor and internal affairs officer.  (*Id.* ¶ 9)  Farneski told Nugent how to report the harassment.  (*Id.* ¶ 10)  Soon thereafter, Nugent filed a Notice of Claim alleging a hostile work environment under New Jersey's Law Against Discrimination. In December 2008, Hurley ordered Farneski to "stop giving out legal advice" to Nugent.  (*Id.* ¶¶ 10-11)

On August 10, 2009, Farneski reported a violation of grand jury procedure by Seana Pappas.  Farneski learned that Pappas had allowed a college intern to attend a grand jury proceeding, which should have been confidential.  (*Id.* ¶¶ 20-21)  Farneski reported the incident to Hurley, who was close with Pappas. (*Id.* ¶¶ 13, 22; P.'s Ex. O)  On August 11, 2009, in reply to an email from Pappas, Hurley informed her that Farneski had reported her actions.  In the same email, he discussed the possibility of Pappas filing a sexual harassment complaint

9

against Farneski. (CMSF2 ¶ 23; P.'s Ex. P) That day, Pappas prepared a memo detailing her sexual harassment claim against Farneski and sent it to Hurley. (CMSF2 ¶ 24) Hurley told Pappas how she could make a formal complaint and informed the Prosecutor of the claim. (*Id.* ¶ 25; P.'s Exs. R, S) Pappas never filed a formal complaint, and no investigation resulted from the memo that she wrote. (CMSF2 ¶ 26) A memo was sent around clarifying HCPO's policy regarding grand jury proceedings, although it did not specifically address the problem of bringing non-law student interns into the proceedings. (*Id.* ¶ 27)

On September 17, 2009, Farneski filed his initial Complaint in this suit against Barnes, Hurley, HCPO, Hunterdon County, and the State of New Jersey. (*Id.* ¶ 32; Dkt. No. 1) After Farneski filed that Complaint, Hurley approached Lacey and Fabiano and asked them if they would file a formal complaint against Farneski stemming from comments Farneski made at a meeting about acceptable conduct during a homicide investigation. (CMSF2 ¶ 33) Lacey declined to do so. (*Id.*) Hurley also removed Farneski from his duties with FACT, and on November 1, 2010, Farneski no longer had supervisory duties in the major crimes unit. (*Id.* ¶ 36) On December 31, 2010, Hurley ended his tenure as Chief of Detectives. (*Id.* ¶ 35)

On July 11, 2011, Farneski reported to HCPO Chief of
Detectives John Kuczynski that he was having marital
difficulties with his wife, Julie Farneski.  (HCPO's Statement
of Facts[7] 2)  On August 3, 2011, Farneski had an argument with
his wife, which resulted in her calling the police and stating
that Farneski was trying to kill her.  (*Id.* ¶ 39; HCPO's
Statement of Facts 3)  Julie Farneski had also hidden Farneski's
service weapon.  (HCPO's Statement of Facts 3)  As a result of
this incident, Farneski was placed on administrative leave
pending a fitness for duty examination.  (*Id.*; CSMF2 ¶¶ 40-41)
On August 10, 2011, Dr. Guillermo Gallegos, a forensic
psychologist, examined Farneski and declared him not fit for
duty, which, among other things, meant that Farneski could not
carry a firearm.  (HCPO's Statement of Facts 3; CSMF2 ¶ 41)  On
September 12, 2011, the Farneskis had another argument, which
Farneski reported to HCPO.  (CSMF2 ¶ 42)  On October 6, 2011,
Dr. Gallegos examined Farneski again and determined that he
still was not fit for duty.  (HCPO's Statement of Facts 3)  The
next day, Dr. Gallegos recommended that Farneski's personal
firearms be removed.  (*Id.*; HCPO's Ex. H)

On October 11, 2011, Chief Kuczynski issued a written
directive to Farneski ordering him to turn over his personal

---

[7] This citation refers to the Statement of Facts in Defendants HCPO's and
Barnes's Motion for Summary Judgment.  (Dkt. No. 70)

weapons to either HCPO or the State Police. (HCPO's Statement of Facts 4) Two HCPO detectives, Sergeant Rowe and Detective DeFilippis went to Farneski's home to deliver the order and collect his personal firearms and firearms purchase identification card. (*Id.*; CMSF2 ¶ 44) Farneski told them that he would only turn over his weapons pursuant to a court order and, using profanity, ordered them off of his property. (CMSF ¶ 44) Farneski believed that it was voluntary that he comply with the order, and thus refused to do so. (*Id.* ¶¶ 44, 49) After consulting with a union attorney, he turned in his personal firearms to the State Police the next day. (*Id.* ¶ 44)

An internal affairs investigation was launched following this incident. (*Id.* ¶ 46) The investigation found that Farneski violated HCPO rules and regulations for insubordination, conduct towards superior and subordinate officers and associates, obedience to laws and regulations, and criticism of official acts and orders. (*Id.* ¶ 28; P.'s Ex. V 5) Farneski was charged with these violations and a hearing was held before Judge Richard Ganter, a Marlboro Township municipal court judge, on October 11, 2012 to resolve the charges. (HCPO's Statement of Facts 5) As of January 7, 2013, no decision had been issued.

After October 11, 2011, Farneski began going to counseling with Dr. Jeffrey Harrison. (CSMF2 ¶¶ 55-56)  In February 2012, Dr. Harrison found that Farneski was not ready to return to duty. (HCPO's Statement of Facts 5)  In May 2012, Farneski underwent a fitness for duty examination with Dr. Gallegos. (CMSF2 ¶ 59)  At the examination, Dr. Gallegos indicated that he thought Farneski could return to work. (*Id.*)  However, prior to Dr. Gallegos declaring Farneski fit for duty, Detective DeFilippis informed Dr. Gallegos that Farneski and Dr. Harrison had a personal relationship outside of their counseling relationship.  Dr. Harrison denied the relationship to Dr. Gallegos on May 14, 2012. (*Id.* ¶¶ 60-62)  Around this time, Dr. Gallegos also obtained files from HCPO's internal affairs investigation surrounding the October 11, 2011 incident.  On May 17, 2012, Dr. Gallegos reported that Farneski was not fit for duty. (*Id.* ¶ 66; HCPO's Statement of Facts 5)

Farneski filed a Supplemental Complaint in this case on May 1, 2012. (Dkt. No. 55)  On July 27, 2012, Farneski retained Dr. John Aylward to conduct a fitness for duty examination.  Aylward found that Farneski was ready to return to duty and had no psychological or psychiatric issues that would impair his ability to work. (CSMF2 ¶¶ 68-69)  Farneski remained on

13

administrative leave and was not declared fit for duty until November 2012.  He continued to receive pay during this period.

At oral argument on January 7, 2013, Farneski's counsel represented that Farneski has been declared fit for duty and has returned to work.  Although his personal firearms and firearms purchaser identification card have been returned to him, Farneski's duty firearm is being withheld pending completion of paperwork.

Defendants have moved for summary judgment on all fourteen counts of Farneski's Supplemental Complaint.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).

"'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323). The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 249.

### III.

Farneski brings numerous claims under both federal and state law, many of which are difficult to discern from his Supplemental Complaint and his briefs. The Court will first address the federal claims and then address the claims arising under New Jersey law.

15

**A.**

Farneski brings claims against Defendants Barnes, Hurley, and Hunterdon County under 42 U.S.C. §§ 1983, 1985(3), and 1986.[8] He alleges violations of his constitutional rights under the First, Second, and Fourth Amendments, as well as violations of procedural due process under the Fourteenth Amendment.  The Court will address each claim in turn.

**1.  First Amendment**

The evaluation of claims brought under § 1983 requires a two-part inquiry.  The court must first "identify the exact contours of the underlying right said to have been violated" to determine whether any deprivation has actually been alleged. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 580-81 (3d Cir. 2003) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).  If there has been a deprivation, the next question is whether a state actor caused the violation.[9]  *Id.* at 581.

The First Amendment, as incorporated against the states through the Fourteenth Amendment, protects a public employee

---

[8] All federal civil rights claims against the Office of the Hunterdon County Prosecutor were dismissed on May 12, 2011, as it is an arm of Hunterdon County for the purposes of those claims.  (Dkt. No. 39)

[9] Defendants have not presented a qualified immunity defense.  As qualified immunity is an affirmative defense, the Court will not discuss it here.  *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 209 (3d Cir. 2001).

from retaliation for engaging in constitutionally protected speech.[10]  *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987).  A public employee's retaliation claim for engaging in a protected activity is evaluated under a three-part test.  First, the plaintiff must establish that he engaged in protected speech or activity.  To satisfy this element, the speech must involve a matter of public concern.  *Connick v. Myers*, 461 U.S. 138, 146-47 (1983).  If his speech is protected, his right must be balanced against the employer's right to promote efficient delivery of its services.  *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).  Second, the plaintiff must show that the protected speech was a substantial or motivating factor in the alleged retaliatory action, and third, the public employer can refute the claim by showing that it would have taken the same action even in the absence of the protected conduct.  *See Baldassare v. New Jersey*, 250 F.3d 188, 194-95 (3d Cir. 2001); *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000).

---

[10] Farneski also alleges violations of his rights to free speech and freedom of petition under the New Jersey Constitution.  *See* N.J. Const. art. I, paras. 6, 18.  Because these protections are "generally interpreted to be co-extensive with the First Amendment," the federal analysis applies to the New Jersey claims as well.  *New Jersey v. Schad*, 733 A.2d 1159, 1169 (N.J. 1999).

*a.  Barnes*

Farneski alleges that Barnes violated his First Amendment right to freedom of speech.  Specifically, he claims that Barnes retaliated against him for participating in Katherine Errickson's lawsuit.  He further claims that Barnes retaliated against him for filing two letters criticizing Barnes over the so-called head butt incident.

With regard to the Errickson lawsuit, Farneski claims that he engaged in protected speech by participating in the lawsuit. Based on the evidence provided, Farneski's participation was limited to others knowing that he was friends with Errickson and supported her lawsuit, noting that HCPO should have expected the lawsuit, and stating that he would testify truthfully at her trial.  Farneski argues that his actions were protected speech as they fall under the duty to testify.  (P.'s Br. in Opp. to Defs. Barnes and HCPO 27)  While it is true that testifying at a trial constitutes a matter of public concern, *Reilly v. City of Atlantic City*, 532 F.3d 216, 231 (3d Cir. 2008), Farneski never testified at trial, nor was he deposed.  Simply stating that he would testify truthfully if asked does not constitute speech touching a matter of public concern.  Likewise, Farneski's friendship with Errickson and his conversation with Hurley cannot be considered protected speech.

Farneski also claims that the two letters he filed with the Office of the Attorney General complaining about Barnes's behavior constituted protected speech and that there was related retaliation.  As Farneski sent these letters in March and April of 2006, this claim is outside the two-year statute of limitations.[11]  *See Cito v. Bridgewater Twp. Police Dept.*, 892 F.2d 23, 25 (3d. Cir. 1989) (holding that New Jersey's two-year statute of limitations period for personal injury actions applies to civil rights claims brought under § 1983); *see also* N.J. Stat. Ann. § 2A:14-2.  Accordingly, the Court will grant summary judgment in favor of Barnes on the First Amendment claims.

### b.  Hurley

Farneski alleges that Hurley retaliated against him for participating in the Errickson lawsuit and Michael Nugent's lawsuit.  He also claims that Hurley violated his right to freedom of petition by retaliating against him for bringing this suit.

---

[11]  The Third Circuit has held that "public employee criticism of office internal operations [are] a matter of public concern." *Swineford v. Snyder Cnty.*, 15 F.3d 1258, 1271 (3d Cir. 1994).  The statute of limitations begins to run upon completion of an act of retaliation.  Farneski has pointed to no instances of retaliation based on these letters in his Complaints or his briefs.  Indeed, many of the non-retaliatory acts discussed above, such as his promotion to Lieutenant and his increased responsibilities, occurred relatively soon after he sent these letters.  Based on the evidence presented, no reasonable jury could find that any retaliatory acts occurred due to Farneski sending these letters.

19

As discussed above, Farneski's claims stemming from Errickson's lawsuit are unfounded based both on the lack of any protected speech and the lack of any attributable retaliation based on the alleged speech.  With respect to Nugent's lawsuit, Farneski argues that he participated in the suit "by directing [Nugent] to the appropriate person to report the offensive materials." (P.'s Br. in Opp. to Defs. Hurley and Hunterdon 5)  Farneski's action was not a protected activity.  There is no record evidence that suggests that Farneski encouraged Nugent's lawsuit in any way or that he provided any assistance to Nugent beyond informing him of the necessary procedures.  Farneski himself did not expose any wrongdoing on HCPO's part.  Further, as Nugent's supervisor and internal affairs officer, telling Nugent how he could file a complaint fell squarely within Farneski's official duties.  As such, this statement is not protected under the First Amendment.  *See Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006); *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009).

Farneski's claim against Hurley based on the instant suit cannot stand either.  Unlike his claims of retaliation under the other two lawsuits, this claim falls under the Petition Clause.  Farneski relies on *San Filippo v. Bongiovanni*, 30 F.3d 434 (3d Cir. 1994) for the proposition that retaliation suits brought

under the Petition Clause may survive even when brought solely
to address matters of private concern.  (P.'s Br. in Opp. to
Defs. Hurley and Hunterdon 24)  But the Supreme Court explicitly
abrogated *San Filippo* and its line of cases in *Borough of Duryea
v. Guarnieri*, 131 S. Ct. 2488 (2011).  In *Guarnieri*, the Court
held that "[i]f a public employee petitions as an employee on a
matter of purely private concern, the employee's First Amendment
interest must give way, as it does in speech cases." *Id.* at
2500.  "A petition that 'involves nothing more than a complaint
about a change in the employee's own duties' does not relate to
a matter of public concern and accordingly 'may give rise to
discipline without imposing any special burden of justification
on the government employer.'" *Id.* at 2501 (citing *United States
v. Treasury Employees*, 513 U.S. 454, 466 (1995)).  Public
employees have the right to participate as citizens in the
democratic process under the Petition Clause; they do not have
the "right to transform everyday employment disputes into
matters for constitutional litigation in the federal courts."
*Id.*  Because there is no evidence on the record to support a
finding that this suit is anything but an "every day employment
dispute[]," Farneski cannot rely on it to sustain a retaliation
claim under the Petition Clause.  Accordingly, the Court will
grant summary judgment for Hurley on all First Amendment claims.

*c.   Hunterdon County*

From Farneski's Supplemental Complaint, it is difficult to tell exactly how Hunterdon County allegedly violated his constitutional rights.  In his brief, Farneski appears to allege a First Amendment retaliation claim.  He claims that various Hunterdon County and HCPO employees have used Hunterdon County's medical leave and internal affairs policies to retaliate against him for bringing this suit by preventing him from returning to work and that Hunterdon County failed to enforce its policies. Farneski further claims that Hunterdon County's failure to enforce its policies constitutes deliberate indifference and that the County is thus liable under § 1983.

As discussed above, this lawsuit is not a protected activity under the First Amendment's freedom to petition, as the suit does not touch on a matter of public concern.  *See Guarnieri*, 131 S. Ct. 2500-01; *see also Campbell v. W. Pittston Borough*, 2012 WL 3329655, at *3 (3d Cir. Aug. 15, 2012) (unpublished opinion).  As Farneski cannot make out a case of First Amendment retaliation, his claims against Hunterdon County fail.

Even assuming that this lawsuit did constitute protected speech, Farneski could not prevail.  Hunterdon County is not

22

liable for the acts of its employees under a theory of respondeat superior or vicarious liability. *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978).  For the County to be liable, Farneski must prove that it had a policy or custom that caused the constitutional violations. *Natale*, 318 F.3d at 583-84.  Farneski bases his claims on the theory that Hunterdon County "has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need." *Id.* at 584 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 417-18 (1997)).

First, Farneski has provided no evidence as to what Hunterdon's medical leave and internal affairs policies actually require.  Second, there is no indication that the existing policies are so inadequate that the County can have expected them to be used as a means to retaliate against employee's lawsuits.  There is no record evidence that the County was deliberately indifferent to how its employees carried out these policies.  In the absence of such a showing, the County cannot

be liable under § 1983, and the Court will grant summary
judgment in its favor on this claim.[12]

### 2.   Second and Fourth Amendments

In his Supplemental Complaint, Farneski alleges violations
of the Second and Fourth Amendments, which appear to stem from
the October 11, 2011 order to turn over his personal firearms.
Farneski clarifies this position slightly in his opposing brief,
stating that the order to turn over his firearms constituted a
violation of his Fourth Amendment rights against warrantless
seizure.  The Court rejects this argument.

It is well settled that voluntary consent creates an
exception to the "requirements of both a warrant and probable
cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973);
*United States v. Stabile*, 633 F.3d 219, 230 (3d Cir. 2011).  In
this case, two Hunterdon County personnel went to Farneski's
home to collect his personal firearms and his firearms purchaser
identification card.  Farneski refused to give them his firearms
that day.  The next day, Farneski voluntarily turned in his
firearms to the State Police.  Nothing in the record supports an

---

[12] Count Eleven of Farneski's Supplemental Complaint alleges violations of an
official policy.  Defendants argue, and the Court agrees, that this Count
fails to state a separate claim upon which relief can be granted but is
instead an element of Farneski's other claims.  As such, Count Eleven will be
dismissed.

inference that Farneski was coerced to turn in his weapons;
indeed, his brief repeatedly states that he did so voluntarily.
Thus, Farneski cannot show that there was an unreasonable
seizure under the Fourth Amendment.[13]

Regarding the Second Amendment claim, Farneski has made no
argument as to how his Second Amendment rights have been
violated.  But even if he had, no violation has occurred here.
In *Maslow v. City of Atlantic City*, this Court held that a Chief
of Police's order to a police officer to turn over his personal
firearms and his firearms purchaser identification card due to
the officer's psychiatric problems did not violate the Second
Amendment.  2011 WL 4859286, at *5 (D.N.J. Oct. 12, 2011).  In
that case, the Chief of Police had authority in his supervisory
capacity to order the officer to relinquish his firearms.  *Id.*
at *4.  The same is true here.[14]  Chief of Detectives John

---

[13] Farneski raises this claim under the New Jersey Constitution as well.  N.J.
Const. art. I, para. 7.  Although the New Jersey Constitution provides
greater protections than the Fourth Amendment, voluntary consent is an
effective exception to New Jersey's warrant requirement as well.  *See New
Jersey v. Domicz*, 907 A.2d 395, 406 (N.J. 2006).  Consequently, the analysis
under that provision—and thus the result—is the same.

[14] The supervisory authority in *Maslow* rested on N.J. Stat. Ann. § 40A:14-118,
which governs regulations of police departments.  However, the statute's
principles are applicable here.  First, the statute that authorizes the
appointment of county investigators states that investigators "shall possess
all the powers and rights and be subject to all the obligations of police
officers . . . in criminal matters."  N.J. Stat. Ann. § 2A:157-10.  Second,
the evidence provided demonstrates that HCPO employed a hierarchy similar to
that of police departments.  The investigators had ranks corresponding to
police officers' ranks, and the investigators reported to the Chief.
Further, Farneski was the subject of an internal affairs investigation as to
whether his refusal to turn over his firearms immediately constituted

Kuczynski sent Farneski a written directive ordering to turn in his firearms and firearms purchaser identification card.  This order was well with Chief Kuczynski's supervisory prerogative, and thus no Second Amendment violation occurred.  Therefore, the Court will grant summary judgment in favor of the Defendants on the Second and Fourth Amendment claims.

### 3.  Fourteenth Amendment

When a plaintiff sues under § 1983 alleging a failure to provide procedural due process under the Fourteenth Amendment,[15] there is a two-part analysis: "(1) whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property; and (2) whether the procedures available provided the plaintiff with due process of law."  *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (internal quotations omitted).  Farneski alleges a property deprivation.[16]  As Farneski alleges different facts with respect to each Defendant, the Court takes them in turn.

---

insubordination, which suggests that he was required to obey direct orders from the Chief of Detectives.

[15] Farneski alleges due process violations under the New Jersey Constitution, art. I, para. 1.  New Jersey courts "apply the same standards developed by the United States Supreme Court under the federal Constitution for resolving due process claims under the New Jersey Constitution."  *State Farm Mut. Auto. Ins. Co. v. New Jersey*, 590 A.2d 191, 199 (N.J. 1991).  Accordingly, the Court considers the state and federal due process claims contemporaneously.

[16] For a plaintiff to have a property interest in continued public employment, he "must have a legitimate claim of entitlement, not just a

*a.  Barnes*

Farneski appears to allege that Barnes violated his due process rights by issuing a formal reprimand to Farneski, transferring Farneski to the terrorism unit, giving him a low raise, and not promoting him.  As a preliminary matter, the formal reprimand and transfer to the terrorism unit both occurred before 2007 and as such are barred by the statute of limitations.  *See Cito*, 892 F.2d at 25.

Furthermore, even if those incidents were not barred, absent a showing that Farneski was discharged, demoted, or lost compensation, there can be no deprivation of a property interest.  *See Kelly*, 107 F.3d at 1077 (holding that).  Nothing in the record supports a finding that Barnes suspended, removed,

---

unilateral expectation." *Latessa v. N.J. Racing Comm'n*, 113 F.3d 1313, 1318 (3d Cir. 1997).  State law governs whether a plaintiff has a property interest in his employment.  *Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1077 (3d Cir. 1997).

Any property interest Farneski might have would arise under N.J. Stat. Ann. § 2A:157-10.1, which controls the manner in which county investigators may be removed from employment.  Under that statute,

a county investigator employed by the county prosecutor shall not be removed from office, employment or position for political reasons or for any cause other than incapacity, misconduct, or disobedience of rules and regulations established by the prosecutor, nor shall such investigator be suspended, removed, fined or reduced in rank from or in office, employment or position therein, except for just cause as hereinbefore provided and then only upon a written complaint setting froth the charge or charges against such investigator.

N.J. Stat. Ann. § 2A:157-10.1.  It is arguable from this language that Farneski has a property right in his employment.  *See Kelly*, 107 F.3d at 1077 (finding that the plaintiff "undoubtedly had a property interest in his position" in construing the nearly identical statute, N.J. Stat. Ann. § 40A:14-147).

fined, or reduced Farneski's rank.  The formal reprimand had no effect on Farneski's employment, nor can Farneski claim that getting a lower raise or not being promoted took away an interest that he already had.  Moreover, N.J. Stat. Ann. § 2A:157-10.1, from which Farneski derives his property interest explicitly states that "the transfer of an investigator from one section or unit to another section or unit within the office shall not constitute a demotion."  Therefore, the Court will grant summary judgment in favor of Defendant Barnes with respect to Farneski's due process claim.

### b.  *Hurley*

Farneski alleges that Hurley violated his due process rights under the Fourteenth Amendment in the following ways: (1) Hurley removed Farneski from supervisory positions within HCPO; (2) Hurley solicited two co-workers to file complaints against Farneski; and (3) Hurley harassed Farneski in other ways, such as separating him from his department, prohibiting him from attending union meetings, using surveillance to track him, and sending him harassing emails.

None of these allegations touch an actual property interest.  Although Hurley reassigned Farneski so that he had fewer supervisory duties, Farneski retained his rank as

Lieutenant and continued to receive the same level of pay. Further, though such conduct might be considered unprofessional, asking co-workers to file complaints against Farneski and finding other ways to harass him did not deprive Farneski of a property interest.  Thus, summary judgment will be granted in favor of Hurley on this claim.[17]

### 4.  § 1985(3) Conspiracy and § 1986 Failure to Prevent

Under 42 U.S.C. § 1985(3), a plaintiff may bring a claim alleging conspiracy to interfere with civil rights if two or more people act together to deprive any person of his civil rights.  To sustain a claim for conspiracy under § 1985(3), a plaintiff must show:  "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege

---

[17]  Neither the Court nor Defendants can find anywhere in Farneski's briefs or his Complaints where he asserts a due process claim against Hunterdon County for suspending him and placing him on administrative leave in response to the incidents with his wife and his initial refusal to turn over his firearms.
    Even if he did make such an assertion, the claim would fail.  Hunterdon County provided Farneski with an opportunity for a hearing to dispute the charges from the internal affairs investigation on October 11, 2012.  At oral argument, counsel indicated that the hearing took place as scheduled before Judge Richard Ganter, a municipal judge in Marlboro Township, and that the parties were awaiting a decision.  This hearing adequately protects Farneski's due process rights.  As such, summary judgment will be granted in favor of Hunterdon County on this claim.

of a citizen of the United States." *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (citing *United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828-29 (1983)). "[B]ecause § 1985(3) requires the 'intent to deprive of *equal* protection, or *equal* privileges and immunities,' a claimant must allege 'some racial, or perhaps otherwise class-based*,* invidiously discriminatory animus behind the conspirators' action' in order to state a claim." *Id.* at 135 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). A § 1985(3) class must have an identifiable existence such that a reasonable person could determine who was in the class based on objective criteria. *Id.* at 136.

    First, Farneski has not even alleged that there is any invidiously discriminatory animus behind any potential conspirators' actions. Furthermore, there is no evidence in the record that Farneski is a member of a racial or class-based group. Farneski is a white male, and nothing in the record supports an inference of any class-based discriminatory animus. At most, it could be said that Barnes and some of the Nine disliked Farneski. But § 1985(3)'s purpose is not to provide a federal remedy for "all tortious, conspiratorial interferences with the rights of others." *Griffin*, 403 U.S. at 101. Given

the lack of invidious animus, the Court will grant summary judgment on Count Three in favor of Defendants.

In his Supplemental Complaint, Farneski alleges that Defendants failed to prevent the deprivation of Farneski's rights resulting from the alleged § 1985(3) conspiracy.  He has provided no briefing that would suggest that he has any other claim arising under § 1986.  The Court will grant summary judgment on the § 1986 claim.  As Farneski has not met the threshold requirements for a § 1985(3) conspiracy, he cannot sustain a § 1986 claim based on such a conspiracy.

## B.

Farneski brings state law claims against the Defendants under the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. §§ 34:12-1 to -14, the New Jersey Law Against Discrimination ("LAD"), N.J. Stat. Ann. §§ 10:5-1 to -49, as well as common law claims of intentional and negligent infliction of emotional distress, retaliation, and violation of public policy.  The Court addresses these claims separately.[18]

---

[18] The state law claims are properly before the Court.  "Once a court has decided to exercise jurisdiction over the state claim . . . , elimination of the federal claim does not deprive the court of the constitutional power to adjudicate the pendent claim."  *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1505 (3d Cir. 1996).  "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see also* 28

### 1.  CEPA

CEPA provides:

An employer shall not take any retaliatory action against
an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or
   to a public body an activity, policy or practice of the
   employer, or another employer, with whom there is a
   business relationship, that the employee reasonably
   believes:

   (1) is in violation of a law, or a rule or regulation
   promulgated pursuant to law . . . ; or

   (2) is fraudulent or criminal . . . ;

b. Provides information to, or testifies before, any public
body conducting an investigation, hearing or inquiry into
any violation of law, or a rule or regulation promulgated
pursuant to law by the employer, or another employer, with
whom there is a business relationship . . . ; or

c. Objects to, or refuses to participate in any activity,
policy or practice which the employee reasonably believes:

   (1) is in violation of a law, or a rule or regulation
   promulgated pursuant to law . . . ;

   (2) is fraudulent or criminal . . . ; or

   (3) is incompatible with a clear mandate of public
   policy concerning the public health, safety or welfare
   or protection of the environment.

---

U.S.C. § 1367(c).  In deciding whether to do so, "the district court should
take into account generally accepted principles of 'judicial economy,
convenience, and fairness to the litigants.'"  *Growth Horizons, Inc. v. Del.
Cnty.*, 983 F.2d 1277, 1285 (3d Cir. 1993) (quoting *United Mine Workers v.
Gibbs*, 383 U.S. 715, 726 (1966)).  In this case, the Court deems it
appropriate to retain jurisdiction.  The parties have completed discovery on
all claims.  Further, the state law claims arise out of the same facts as the
federal claims, and the analysis of these claims are substantially related.
Remanding the claims at this late stage would cut against principles of
judicial economy, convenience, and fairness.

N.J. Stat. Ann. § 34:19-3.  Under CEPA, a plaintiff must bring
his claim within one year of the alleged violation.  *Id.*
§ 34:19-5.  The CEPA claim accrues on the date of the
plaintiff's actual demotion, suspension, or termination of
employment.  *Alderiso v. Med. Ctr. of Ocean Cnty., Inc.*, 770
A.2d 275, 277 (N.J. 2001); *Villalobos v. Fava*, 775 A.2d 700, 707
(N.J. Super. 2001).

In his brief, Farneski identifies three incidents on which
he bases these claims:  (1) Farneski reported that Linda
Fabiano's falsified her time sheets in late 2004; (2) he
reported that Fabiano had made inappropriate comments on an
interrogation tape and later altered the tape to delete those
comments[19] in June 2005; and (3) in August 2009, he reported
violations of grand jury policies and practices on the part of
Seana Pappas to Hurley.

Defendants argue that CEPA's one-year statute of
limitations bars these claims.  Farneski counters that these
incidents fall within the continuing violation exception to the
statute of limitations.  The Court agrees with the Defendants.

The continuing violation doctrine applies when a plaintiff
brings suit alleging a series of acts that do not individually

---

[19] The comments on the tape were unrelated to any pending criminal
investigation.

support liability but which, taken together, may establish a
hostile work environment.  There is "a bright-line distinction
between discrete acts, which are individually actionable, and
acts which are not individually actionable but may be aggregated
to make out a hostile work environment claim.  The former must
be raised within the applicable limitations period or they will
not support a lawsuit."  *O'Connor v. City of Newark*, 440 F.3d
125, 127 (3d Cir. 2006) (citing *Nat'l R.R. Passenger Corp. v.
Morgan*, 536 U.S. 101, 113 (2002)); *see also Green v. Jersey City
Bd. of Educ.*, 828 A.3d 883, 891 (N.J. 2003) (applying the
continuing violation doctrine in the CEPA context).  If a
plaintiff has "alleged one or more discrete acts of
[retaliatory] conduct by defendants . . . then [his] cause of
action would have accrued on the day on which those individual
acts occurred."  *Shepherd v. Hunterdon Developmental Ctr.*, 803
A.2d 611, 623 (N.J. 2002). Discrete acts include "termination,
failure to promote, denial of transfer, refusal to hire,
wrongful suspension, wrongful discipline, denial of training,
[and] wrongful accusation."  *O'Connor*, 440 F.3d at 128.

    Although Farneski argues in one part of his brief that the
continuing violation doctrine applies to his claims due to
Defendants' continued retaliation against him, this reasoning
does not stand.  In contrast to most of his briefing and his

Complaints, the section of Farneski's brief that addresses CEPA is one of the few places where he clearly identifies the bases for his claims.  Farneski specifies three incidents that he believes constitute protected activity.  Below the first two incidents, he lists discrete acts that he alleges occurred based on his protected activity.  (P.'s Br. in Opp. to Defs. Hurley and Hunterdon 33-34).

Because Farneski cannot satisfy the continuing violation doctrine, the one-year statute of limitation applies.  Thus, the Court must examine each discrete act to determine whether that act is time barred.

First, with respect to Farneski reporting that Fabiano falsified time sheets, Farneski alleges that he was issued a formal reprimand soon after the incident.  Neither party has provided evidence as to exactly when the reprimand was issued.  However, based on the evidence presented, it appears that Farneski was reprimanded sometime between 2004 and 2007.  (P.'s Ex. D 22:20-24:7, 28:23-29-24, 31:22-32-24)  Even if the Court accepts that the reprimand occurred at the end of 2007, that date is more than a year before Farneski filed this suit.  Thus, the CEPA claim based on that act is barred.  Farneski also claims that he was passed over for promotion twice as a result of that incident.  The alleged failures to promote took

place in 2004 and late 2005 or early 2006.  These acts are also outside of CEPA's statute of limitations.

Second, Farneski's brief cites his transfer to the terrorism unit as retaliation for reporting the altered interrogation tape.  Although he provides no specific date for this transfer, Farneski testified that he was transferred back to major crimes from the terrorism unit in January 2007.  Thus, this claim is also outside the statute of limitations, and therefore time barred.

Farneski's remaining CEPA claim involves retaliation that occurred after Farneski reported violations of the grand jury policy in August 2009.  As Farneski filed this Complaint in September 2009, any retaliation would be well within CEPA's limitations period.  The Court addresses that claim next.

To prevail on a CEPA claim, a plaintiff must show that "(1) he reasonably believed that his employer's conduct was violating a law or rule or regulation promulgated pursuant to law, (2) he objected to the conduct, (3) an adverse employment action was taken against him, and (4) a causal connection exists between the whistleblowing activity and the adverse employment action." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 405 (3d Cir. 2007).

A reasonable jury could find that Farneski believed that allowing an intern to sit in on confidential grand jury proceedings violated HCPO's policies and that he objected to the conduct. Thus, the Court must determine whether there was an adverse employment action and, if so, whether there is a causal connection between that action and Farneski's report.

Under CEPA, retaliatory action is defined as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19-2(e). An adverse employment action must have either had an impact "on the employee's compensation or rank or be virtually equivalent to discharge in order to give rise to the level of a retaliatory action required for a CEPA claim." *Klein v. Univ. of Med. & Dentistry of N.J.*, 871 A.2d 681, 692 (N.J. 2005).

Farneski does not clearly state which acts he considers to be retaliation for reporting the grand jury violation. Based on a broad reading of the statement of facts and arguments in his brief, it appears that these acts include Hurley encouraging Pappas to file a sexual harassment complaint against Farneski, Hurley approaching two other officers to file a complaint against Farneski regarding a homicide investigation, and Farneski's removal from all supervisory activities.

37

Hurley's attempt to solicit complaints against Farneski do not constitute adverse employment actions within the meaning of CEPA. First, although Pappas sent a memo to Hurley detailing her problems with Farneski, she never made any formal complaint. Second, the other two officers, Lacey and Fabiano, declined Hurley's request that they file a complaint. Farneski has not claimed that either of these incidents led to any actions against him, such as an investigation or other disciplinary action. Thus, neither of these incidents had any impact on Farneski's terms and conditions of employment.

It does not appear that the removal of Farneski's supervisory duties had any impact on his compensation or rank, nor can Farneski show that his report of Pappas's violation caused his removal from FACT and major crimes. As a preliminary matter, nothing on the record indicates when Farneski was removed from FACT. Further, Hurley relieved Farneski of his supervisory position in major crimes on November 1, 2010, over a year after Farneski made his complaint. Finally, there is ample evidence to show that Hurley had been alleviating Farneski of his supervisory duties well before Farneski reported the breach in grand jury proceeding policy. Farneski himself stated that he had ceased supervising several other units in the summer and fall of 2008. This trend makes it unreasonable for a jury to

find a causal relationship between Farneski's removal from FACT

at an unspecified date and major crimes over a year later and

his report about the grand jury investigation.  *Cf. Clayton v.*

*City of Atlantic City*, 722 F. Supp. 2d 581, 589 (D.N.J. 2010)

(finding that a plaintiff could not make out a CEPA claim where

there was a pattern of discrimination and harassment before she

engaged in protected activity).  Accordingly, the Court will

grant summary judgment on all CEPA claims in favor of the

Defendants.


### 2.  New Jersey Law Against Discrimination

Farneski alleges that he was retaliated against in

violation of the New Jersey Law Against Discrimination ("LAD")

for assisting in Errickson's and Nugent's lawsuits.  The LAD

provides:

> It shall be unlawful employment practice . . . [f]or any
> person to take reprisals against any person because that
> person has opposed any practices or acts forbidden under
> this act or because that person has filed a complaint,
> testified or assisted in any proceeding under this act or
> to coerce, intimidate, threaten or interfere with any
> person in the exercise or enjoyment of, or on account of
> that person having aided or encouraged any other person in
> the exercise or enjoyment of, any right granted or
> protected by this act.

N.J. Stat. Ann. § 10:5-12d.  "[T]o establish a prima facie case

of discriminatory retaliation, plaintiffs must demonstrate that:

(1) they engaged in a protected activity known by the employer;

(2) thereafter their employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation." *Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1192 (N.J. 2008).

In this case, Farneski claims that he engaged in a protected activity by assisting Errickson with her LAD lawsuit. As described above, his assistance included unspecified support for her lawsuit and stating that he would testify truthfully at her trial.[20]  These actions do not rise to the level of protected activity under the LAD.  For a plaintiff to be a protected person through his assistance of another's LAD proceeding, the plaintiff must actively support that person's lawsuit, such as by providing written statements in support of the suit. *Shepherd*, 803 A.2d at 615, 625.  The fact that Farneski stated that he would testify truthfully if called does not implicate the same kind of support.  Farneski's involvement with the Nugent suit, that is, informing Nugent how he could file a claim when he was his supervisor and internal affairs officer, is similarly unprotected under the LAD.  Accordingly, the Court grants summary judgment in favor of Defendants on this count.

---

[20] Farneski also claims that he objected to Errickson's treatment, but there is no record evidence to support this assertion, not even in the portions of his own deposition provided to the Court.

40

### 3.  Common Law Claims

#### a.  *Infliction of Emotional Distress*

Defendants argue that Farneski's claims of intentional and negligent infliction of emotional distress are barred by his failure to file a Notice of Claim pursuant to the New Jersey Tort Claims Act.  Farneski does not oppose this assertion. Under N.J. Stat. Ann. § 59:8-8, a plaintiff must file a notice of claim for a cause of action against a public entity or employee within 90 days of accrual of his claim.  Failure to do so results in the plaintiff being "forever barred from recovering against a public entity or public employee."  *Id.* Farneski did not file any notice of claim in this case.  Thus, the Court will grant summary judgment in favor of the Defendants on Counts Twelve and Thirteen.

#### b.  *Public Policy and Retaliation*

Defendants argue that Farneski's violation of public policy and common law retaliation claims should be dismissed for failure to state claims upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).  As Farneski's LAD claim and CEPA claim preempt these claims, they will be dismissed as to all Defendants.  *See DeJoy v. Comcast Cable Commc'ns Inc.*, 941 F. Supp. 468, 475 (D.N.J. 1996) (holding that plaintiff's LAD claim

preempted his common law public policy claim); *Young v. Schering Corp.*, 660 A.2d 1153, 1159 (N.J. 1995) (holding that filing a CEPA claim waives any common law retaliation remedies).

c.  *Respondeat Superior and Punitive Damages*

Farneski seeks liability against Defendants Hunterdon and HCPO through the doctrine of respondeat superior.  He also seeks punitive damages with respect to all Defendants.  However, as all of the claims that would form the basis of liability for these two counts will be granted in favor of Defendants, Farneski cannot prevail on these counts.[21]  Accordingly, summary judgment will be granted as to all Defendants on Counts Ten and Fourteen.

---

[21] In any event, Hunterdon County cannot be held liable under respondeat superior for any of the § 1983 claims, as discussed above.  Neither can it be liable for punitive damages for those claims.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

Punitive damages are also unavailable with respect to the individual Defendants, Barnes and Hurley.  In § 1983 cases, punitive damages are appropriate "where the defendants have acted with a 'reckless or callous disregard of, or indifference to, the rights and safety of others.'"  *Keenan v. City of Phila.*, 983 F.2d 459, 469-70 (3d Cir. 1992) (quoting *Bennis v. Gable*, 823 F.2d 723, 734 (3d Cir. 1987)).  Based on the evidence presented, that standard is not met here.

Finally, under New Jersey law, punitive damages are available "when the wrongdoer's conduct is especially egregious."  *Fischer v. Johns-Manville Corp.*, 512 A.2d 466, 472 (N.J. 1986) (quoting *Leimgruber v. Claridge Assocs., Ltd.*, 375 A.2d 652, 655 (N.J. 1977)).  Nothing in the record supports a finding that any of the Defendants acted in an "especially egregious" manner.

**IV.**

For the foregoing reasons, summary judgment will be granted on all counts for the Defendants.  An appropriate Order accompanies this Opinion.


Date:  January 9, 2013


                                    /s/ Joseph E. Irenas _____

                                    **Joseph E. Irenas, S.U.S.D.J.**

43